LEE, P.J.,
for the Court.
FACTS AND PROCEDURAL HISTORY
¶ 1. William (Bill) and Ruth Ann Strei-beck were married on August 18, 1991. Bill and Ruth Ann had one child during the marriage named Ann Klein. Ruth Ann has two children from a prior marriage, John and Steven. Bill has a child named Jason, also from a previous marriage. At the time Bill and Ruth Ann divorced, John was twenty-five years old, and Jason and Steven were nineteen. Bill received his juris doctorate from the University of Mississippi in 1989. Ruth Ann has a master’s degree in mathematics education, which she received prior to the marriage. Bill is a sole practitioner in Greenville, and Ruth Ann teaches in the Greenville public school system. Bill and Ruth Ann separated around April 24, 2000, and were granted a divorce on November 29, 2003. Neither party was satisfied with the chancellor’s findings regarding alimony, assets, and child support.
¶ 2. Bill filed his appeal, arguing (1) that the chancellor erred in calculating the value of Ruth Ann’s non-marital property by not including her interest in the family partnership; (2) the chancellor erred in calculating the value of Ruth Ann’s property by failing to include the $34,055 paid by Bill to Ruth Ann as compensation for equity in the marital home; (3) the chancellor erred in granting Ruth Ann periodic alimony; (4) the chancellor erred by ordering Bill to pay one-half of Ann Klein’s private school tuition; and (5) the chancellor erred by requiring Bill to pay one-half of Ann Klein’s college expenses which are not covered by the MPACT certificate purchased by Bill prior to the parties’ separation.
¶ 3. Ruth Ann filed her cross-appeal, arguing (1) that the chancellor erred in awarding inadequate child support and by merging the tuition payments and health insurance payments into the child support amount; and (2) the chancellor erred by failing to make an accurate determination of the marital assets and by not making a fair and equitable division and distribution of the marital assets between the parties. Finding that the chancellor erred, we reverse and remand in part and affirm in part.
STANDARD OF REVIEW
¶ 4. “On appeal [we are] required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong.” Newsom v. Newsom, 557 So.2d 511, 514 (Miss.1990). Since the decision to award alimony, as well as the amount, is left to the discretion of the chancellor, we will not reverse unless the chancellor manifestly erred or abused his discretion. Voda v. Voda, 731 So.2d 1152, 1154(¶ 7) (Miss.1999). This is particularly true in the areas of divorce, alimony and child support. Henley v. Jones, 880 So.2d 382, 384(¶ 5) (Miss.Ct.App.2004).
DISCUSSION OF ISSUES
¶ 5. Although there are a total of seven issues presented to this court on appeal and on cross-appeal, the issues can be adequately summarized and addressed as follows: (1) whether the chancellor erred *632 in determining the parties’ marital and non-marital assets; (2) whether the chancellor erred in distributing the marital assets; (3) whether the chancellor erred in awarding alimony; (4) whether the chancellor erred in his child support determination; and (5) whether the chancellor erred in ordering Bill to pay one-half of Ann Klein’s college expenses not covered by the MPACT certificate.
I. DID THE CHANCELLOR ERR IN DETERMINING THE PARTIES’ MARITAL AND NON-MARITAL ASSETS?
¶ 6. In Mississippi, the division of marital assets begins with determining which assets are marital and non-marital under the criteria established in Hemsley v. Hemsley, 639 So.2d 909 (Miss.1994). For the purpose of divorce, our supreme court defined marital property as being “any and all property acquired or accumulated during the marriage. Assets so acquired or accumulated during the course of the marriage are marital assets and are subject to an equitable distribution by the chancellor.” Id. at 915. For the purpose of calculating whether or not assets are marital or non-marital, the “course of the marriage” runs until the date of the divorce judgment, and an otherwise marital asset may be classified as separate if an order for separate maintenance is entered. McIlwain v. McIlwain, 815 So.2d 476, 479(¶ 7) (citing Godwin v. Godwin, 758 So.2d 384(¶ 6) (Miss.1999)).
¶ 7. Prior to trial, Bill and Ruth Ann stipulated that certain property was not marital property, namely various household appliances and furniture; Bill and Ruth Ann’s respective retirement accounts; accounts held by Ruth Ann in the names of her children and an account held by Bill in the name of his son Jason; Bill and Ruth Ann’s respective savings accounts; Ruth Ann’s share in her family’s partnership, Lea Brent Family Investments; the 1999 Tahoe and the 1993 Bronco belonging to Ruth Ann, and the 1990 Toyota and 2002 Tahoe belonging to Bill. Thus, the chancellor concluded that the only marital asset requiring disposal was the marital home.
¶ 8. On cross-appeal, Ruth Ann argues that Bill’s contingency fee from a pending case should constitute marital property and that the fee should be subject to equitable distribution. Bill asserts that under Aron v. Aron, 832 So.2d 1257, 1259(¶ 8) (Miss.Ct.App.2002), the chancellor properly did not characterize the forthcoming fee as marital property. In his brief, Bill argues that the litigation for the case did not begin until after May 26, 2002; thus, because the litigation did not begin until after the parties separated in April of 2000, any revenue generated from the case should not constitute marital property.
¶ 9. It is true that in some instances chancellors have been granted greater discretion in classifying assets acquired later in the marriage. In Aron, this Court found that “[t]he chancellor has discretion in determining whether acquisitions made in a marriage’s dying stages qualify as marital or separate property.” Aron, 832 So.2d at 1259(¶ 8). Furthermore, in Selman v. Selman, a chancellor divided some $1350 in the wife’s retirement which had accumulated after the parties separated. The supreme court reversed, finding that “while the marriage had not legally terminated, the relationship out of which equitable distribution arises had ended some months earlier. There is no justification in equity to allow [the husband] to share in this meager accumulation.” Selman v. Selman, 722 So.2d 547, 553(¶ 24) (Miss.1998). Notably, the supreme court did not state that the property was not marital property; rather, the supreme court deter *633 mined that under Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994), there was no justification to allow the husband to share in the retirement.
 ¶ 10. While the entry of a separate maintenance order may be a line of demarcation for classifying property as marital or separate, no such order was entered in the case sub judice. See Godwin, 758 So.2d at (¶ 6). However, no such order was entered in the case sub judice. We have previously determined that “[assets acquired during the course of marriage are marital assets and subject to equitable distribution unless it can be proven that such assets belonged to one of the separate estates prior to marriage.” Flechas v. Flechas, 791 So.2d 295(¶ 8) (Miss.Ct.App.2001). Additionally, the burden is upon one claiming assets to be non-marital to demonstrate to the court their non-marital character. A & L, Inc. v. Grantham, 747 So.2d 832, 839(¶ 23) (Miss.1999).
¶ 11. We do not agree with the chancellor’s conclusion in the case sub ju-dice. Although the chancellor clearly considered Bill’s fee as part of his net worth, the record does not indicate that this case is analogous to the facts of either Selman or Aron, and we see no justification in concluding that the fee is non-marital property. Although Ruth Ann testified that the marriage had failed prior to the divorce, we are not convinced that at least part of the fees were not acquired during the marriage.
¶ 12. The trial was held on July 30 and 31, 2003; at trial, Bill testified that he had not actually received money from the pending case, but that he was anticipating a payment valued at approximately $350,000. On September 3, 2003, Bill filed an affidavit with the trial court in response to Ruth Ann’s motion to reopen the issue of his income. The affidavit reflected that, as of September 3, 2003, Bill had received approximately $237,960 as partial payment of $548,000 in fees from the litigation. The affidavit further estimated that Bill’s tax liability would leave him with a net of approximately $323,320.
¶ 13. The judgment of divorce was entered December 2, 2003, and the chancellor used the $323,320 in calculating Bill’s worth. The record does not indicate if Bill received the additional $310,040 prior to the divorce decree; however, it is clear that Bill acquired at least $237,960 while the parties were still married.
¶ 14. As in Mcllwain, we find that “the key factor is that funds were acquired during the marriage, thus rendering them marital assets.” 815 So.2d at 479(¶ 7) (emphasis in original). In sum, first the assets are classified as marital or non-marital according to Hemsley. The marital property is then equitably divided, employing the Ferguson factors as guidelines, in light of each parties’ nonmarital property. Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994).
¶ 15. At a minimum, Bill brought an additional $237,960 into the marriage prior to the divorce decree. We agree with Ruth Ann’s contention that the chancellor erred in not considering these funds as marital property; however, on remand, the chancellor should determine if Bill obtained more of the fee prior to the judgment of divorce. As in Selman, it is entirely possible that there is no equitable reason for Ruth Ann to share in this fee. This is to be decided by the chancellor on remand after an appropriate application of the law as enunciated in Hemsley and Ferguson. Issue II on cross-appeal has merit.
¶ 16. On appeal, Bill argues that the chancellor erred in not considering Ruth Ann’s interest in the family partner *634 ship as part of her net worth. The parties stipulated that this partnership interest is non-marital, and that classification is not contested on appeal.
¶ 17. The chancellor found that Ruth Ann’s assets were as follows: Public Employee Retirement account valued at $39,534; IRA account valued at $525; brokerage account of $91,270; checking and savings account of $5,234; furniture, jewelry, silver and other personal property valued at $21,905; and a Ford Bronco valued at $2,500.
¶ 18. The chancellor determined that the total value of Ruth Ann’s assets was $160,969. This amount does not include Ruth Ann’s one-sixth partnership interest in nineteen life insurance policies insuring the life of her father. As of March 2003, the policies had a cash surrender value of $1,072,726, and Ruth Ann’s one-sixth interest totaled $295,125. The chancellor also determined that, assuming the partnership did not dispose of any assets and the value of the policies remained the same until Ruth Ann’s father dies, Ruth Ann’s one-sixth interest was $762,337. The partnership also owned various assets including land, stocks, a certificate of deposit and an unsecured loan in the amount of $227,000 to a business operated by Collins Brent who is Ruth Ann’s brother and the partnership’s managing partner.
¶ 19. Brent’s primary responsibility is to invest and manage the partnership assets. At trial he testified that the partnership had, on occasion, agreed to liquidate a few of the partnership’s assets and disburse the funds to the siblings for the payment of taxes. The disbursements to Ruth Ann between January of 1996 and March of 2003 totaled approximately $83,350. Brent testified that these funds were used to pay taxes from gains in the partnership. Brent also testified that Ruth 7km received no monthly income from the partnership and that nothing was guaranteed to her.
¶ 20. On appeal, Bill asserts that Ruth .Anris property interest in the partnership should be included as part of her assets. We agree. Her interest is an asset which she may sell pursuant to the partnership agreement. As such, the trial court erred in not considering, at a minimum, the present value of Ruth Trim’s interest in valuing her assets. Bill’s first issue on appeal has merit. Accordingly, we reverse and remand for a determination of marital property and non-marital property that is consistent with this opinion.
II. DID THE CHTriSlCELLOR ERR IN DISTRIBUTING THE MARITAL ASSETS?
¶ 21. Once property has been classified as either marital or non-marital, the marital property is then equitably divided applying the Ferguson factors in light of the parties non-marital property. Tynes v. Tynes, 860 So.2d 325, 328(¶ 6) (Miss.Ct.App.2003). Having found in Section I. of this opinion that the chancellor should have classified Bill’s contingency fee in the pending case as marital property, it logically follows that the distribution of the marital assets was, in part, in error to the extent that the Ferguson factors were not applied to the fee.
¶ 22. Neither party contests the division of the marital home. The chancellor determined that Bill should pay Ruth Trim $34,055, or the value of half of the equity of the home. In exchange, Ruth Ann deeded her interest in the home to Bill.
¶ 23. As his second issue on appeal, Bill argues that the chancellor erred again in calculating the value of Ruth Anris assets by not including the $34,055 paid to her as compensation for the equity in the marital home.
*635 ¶ 24. Notably, Bill’s $34,055 of equity in the home was not included in the total amount of his assets either. We find that this is, at best, a harmless error that does not rise to the level of an abuse of discretion. Both parties’ total net worths could have been increased by $34,055; however, the disparity between the two estates would have remained the same. Nevertheless, because this case is being remanded as previously discussed in this opinion, on remand the chancellor should include the amount of equity given to each party prior to determining if alimony is necessary.
III. DID THE CHANCELLOR ERR IN AWARDING ALIMONY?
¶ 25. “If there are sufficient marital assets which, when equitably divided and considered with each spouse’s non-marital assets, will adequately provide for both parties, no more need be done.” Tynes, 860 So.2d at (¶ 6) (citing Johnson, 650 So.2d at 1287). The question of awarding alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit. Lauro v. Lauro, 847 So.2d 843, 848 (Miss.2003). In Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993), our supreme court established the twelve factors that must be considered by a chancellor in arriving at findings and entering a judgment for alimony. These factors are:
(1) the income and expenses of the parties;
(2) the health and earning capacity of the parties;
(3) the needs of each party;
(4) the obligations and assets of each party;
(5) the length of the marriage;
(6) the presence and absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide child care;
(7) the age of the parties;
(8) the standard of living of the parties, both during the marriage and at the time of the support determination;
(9) the tax consequences of the spousal support order;
(10) any fault or misconduct;
(11) wasteful dissipation of the assets by either party;
(12) or any other factor deemed by the court to be “just and equitable” in connection with the setting of spousal support.

Id.

¶ 26. Bill argues that, had the chancellor properly considered all of Ruth Ann’s assets, Ruth Anris net worth would have exceeded his own, and an award of alimony would be unnecessary. We have determined that the chancellor erred in valuing Ruth Anris net worth. As such, it is entirely possible that the separate assets of the parties will adequately provide for their respective households. We reverse and remand for a consideration of alimony — if necessary — after dividing the parties’ assets in a manner consistent with this opinion.
IV. DID THE CHANCELLOR ERR IN HIS CHILD SUPPORT DETERMINATION?
¶ 27. “On appeal [we are] required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong.” Henley, 880 So.2d at 384-85(¶ 5). “The word ‘manifest,’ as defined in this context, means ‘unmistakable, clear, plain, or indisputable.’ ” Id. (citing Black’s Law Dictionary 963 (6th ed. 1990)).
*636 ¶28. Neither party is satisfied with the chancellor’s child support award. On cross-appeal, Ruth Ann contends that the child support award is grossly inadequate. Ruth Ann asserts that the chancellor erred in not following the child support guidelines enunciated in Mississippi Code Annotated Section 43-19-101 (Rev. 2004). Ruth Ann asserts that Ann Klein should receive 14% of Bill’s average monthly income, which by Ruth Ann’s estimation is $14,514. Thus, Ruth Ann argues that under the child support guidelines, Ann Klein should receive child support in the amount of $2,032.
¶ 29. We will address Ruth Ann’s contention first. Surprisingly, Ruth Ann does not mention the provision of Section 43-19-101, which allows a chancellor to make a written finding as to the reasonableness of the application of the statutory guidelines in the event a parent’s adjusted gross income exceeds $50,000. See Miss. Code Ann. § 43-19-101(4) (Rev. 2004).
¶ 30. The chancellor determined that as a sole practitioner, Bill’s income varied considerably from 2000 to 2003. The chancellor also determined that Bill’s yearly income exceeded $50,000. The chancellor found that “[a]ny attempt to apply the guidelines on these facts would have no realistic relationship to the actual needs of the child.” The chancellor found that there was “very little evidence in this record concerning Ann Klein’s basic needs and necessary expenses for food, supplies, housing, utility bills and clothing.” We agree that the chancellor made sufficient findings in support of his conclusion that applying the statutory guidelines would be unreasonable. Ruth Ann has failed to make a showing that the chancellor abused his discretion in setting the child support. As such, Ruth Ann’s first issue on cross-appeal lacks merit.
¶ 31. Bill's complaint about the child support award centers around the payment of Ann Klein’s private school tuition, specifically the chancellor’s ruling that Bill should pay one-half of Ann Klein’s private school tuition as part of his child support obligations. This additional expense adds approximately $180 dollars, resulting in a total child support payment of $550 per month. Bill’s primary complaint is that “Ruth Ann made the unilateral decision to enroll Ann Klein in private school.” Bill cites Laird v. Blackburn, 788 So.2d 844, 852(¶ 15) (Miss.Ct.App.2001), and Collins v. Collins, 722 So.2d 596, 599(¶ 9) (Miss.1998), in support of his argument that this Court disfavors a parent’s unilateral decision to enroll a child in private school.
¶ 32. The case sub judice is distinguishable from Laird. In Laird, the mother filed a contempt action against Blackburn for failing to pay, among other items, their child’s private school tuition. At the contempt hearing the father testified that he had no knowledge that the mother had moved out of state and enrolled the child in private school. The trial chancellor was unwilling to include the tuition payment when the original child support order did not specifically require such a payment. On appeal, this Court affirmed, noting that “[t]he child support agreement requires as a prerequisite the parties’ consultation and agreement with regard to matters of education.” Laird, 788 So.2d at 852(¶ 15).
¶ 33. In the case sub judice, the chancellor reviewed Ruth Ann’s decision to enroll Ann Klein in private school, as well as Bill’s objections to the enrollment, prior to entering a child support order. Additionally, the chancellor concluded that Bill’s “antagonism and lack of cooperation is evidenced by his objection to Ann Klein [sic] attending a private school. This objection appears to be based on nothing more than *637 plaintiff [sic] placing the child in the private school without consulting the defendant [,] and he doesn’t believe that private school education is essential.” The chancellor further noted that Bill had “no specific criticism of Ann Klein’s schooling.” Furthermore, the chancellor determined that Ann Klein was placed in the private school because most of her friends attend the school. Although Ann Klein was only a second grader at the time of trial, the chancellor noted that Ann Klein was doing well in school.
¶ 34. We do not agree that the chancellor abused his discretion in this instance. While it is true that our supreme court has previously stated that private school tuition should not be awarded in some factual circumstances, we cannot find that the chancellor erred in this instance. See Collins, 722 So.2d at 599(¶ 9). The record contains credible evidence that Ann Klein is prospering in the private school and that Bill’s objections to such an education are groundless. Bill’s fourth assignment of error lacks merit.
IV. DID THE CHANCELLOR ERR IN ORDERING BILL TO PAY ONE-HALF OF ANN KLEIN’S COLLEGE EXPENSES THAT ARE NOT COVERED BY THE MPACT CERTIFICATE?
¶ 35. In Pass v. Pass, 238 Miss. 449, 458, 118 So.2d 769, 773 (1960), our supreme court said:
[W]e hold that where the minor child is worthy of and qualified for a college education and shows an aptitude therefor it is the primary duty of the father, if in reason financially able to do so, to provide funds for the college education of his minor child in the custody of the mother, where the mother and father are divorced and living apart.
¶ 36. On December 29, 2000, Bill purchased an MPACT certificate in the amount of $9,973 for Ann Klein’s college education. Ann Klein was only eight years old at the time of the divorce. The chancellor ordered that once the MPACT funds are exhausted, both Bill and Ruth Ann shall each pay “one-half of Ann Klein’s college expenses, which shall include tuition, room, board, books, fees, transportation, i.e. an automobile, insurance, gas, oil, maintenance and sorority.”
¶ 37. Bill argues that this was manifest and clear error, citing Hambrick v. Prestwood, 382 So.2d 474, 477 (Miss.1980), and Harmon v. Yarbrough, 767 So.2d 1069, 1071(¶ 6) (Miss.Ct.App.2000). In Ham-brick, the father was ordered to pay the daughter’s college tuition. The daughter refused to see her father for visitation for seven years and testified that she disliked her father and would categorize her feelings towards him as hatred. Our supreme court found that “[t]he duty of a father to send a child to college, under the circumstances of this case, is not absolute.” Hambrick, 382 So.2d at 477. That duty “is dependent, not only on the child’s aptitude and qualifications for college, but on whether the child’s behavior toward, and relationship with the father, makes the child worthy of the additional effort and financial burden that will be placed on him.” Hambrick, 382 So.2d at 477. The Court did not abandon the rule adopted in Pass, stating “[w]e continue to adhere to the holding in Pass v. Pass, supra, but this case demonstrates that no rule of law is or should be completely inflexible. The facts of some cases require exceptional treatment and this is one of those.” Id. at 478.
¶ 38. Bill references Harmon in support of his contention that “[t]his Court has previously found it improper to impose an obligation to pay college expenses on a parent in divorce proceeding until the child *638 is college age.” While Harmon deals with a conflict regarding the payment of college tuition, it is easily distinguished from the case sub judice. In Harmon, the father and mother entered into an agreement in 1984, stipulating that the father would “provide for said child’s higher education.” At the time of the divorce, the child was only three years old. In 1999, the mother sought to have the father held in contempt for failure to pay for the daughter’s college expenses.
¶ 39. In Harmon we stated “[sjince the duty is dependent upon several factors, including the child’s suitability for college and his or her relationship with the supporting parent at the time of the expenditures, it would normally be improper to impose that obligation when the child is only three years old.” Id. at 1071(¶ 6). However, this Court found that the father in Harmon was bound by his agreement, albeit ambiguous, because “[t]he financial duty may well have been beyond the chancellor’s authority to impose in 1984, but it was not beyond the father’s ability to accept.” Id. at (¶ 8).
¶ 40. In Hambrick, our supreme court determined that a child’s ability is one factor that should be considered in requiring a parent to bear the additional expense of a college education. Hambrick, 382 So.2d at 478. Bill clearly agrees that Ann Klein possesses the intelligence and the ability to attend college, for he purchased an MPACT certificate to pay for her college education. Thus, Bill’s argument against paying for additional college expenses necessarily revolves around the possibility that his relationship with Ann Klein will deteriorate over the next few years to the extent that he should not be required to assist with her post-secondary education.
¶41. With that in mind, we do not agree that the case sub judice requires such “exceptional treatment” as meted out in Hambrick. Nothing in the record indicated that eight year old Ann Klein rejects her father’s love and attention. Nothing in the record indicated that Ann Klein has demonstrated that she is unworthy of this additional expense. Furthermore, this Court notes that the burden is not one placed solely on Bill’s shoulders, for Ruth Ann is also responsible for paying one-half of Ann Klein’s additional expenses. We do not agree that the chancellor committed manifest error in this requirement. In finding that the chancellor’s order in the case sub judice was proper, we do not abandon our previous assertion that such an order would normally be improper for a three year old child. However, by previously making arrangements to pay for Ann Klein’s college, Bill has acknowledged that, to some extent, he agrees that she possesses the aptitude to attend an institution of higher education. Until Bill shows that his relationship with Ann Klein has deteriorated, we are not inclined to obfuscate the parental responsibility enunciated in Pass. Accordingly, we affirm the ruling of the chancellor on this issue.
¶ 42. THE JUDGMENT OF THE CHANCERY COURT OF WASHINGTON COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART ON DIRECT APPEAL AND ON CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY TO THE APPELLANT AND THE APPELLEE.
BRIDGES, P.J., MYERS, CHANDLER, GRIFFIS, BARNES and ISHEE, JJ., CONCUR. KING, C.J., AND IRVING, J., NOT PARTICIPATING.